And good morning everyone. Judge Barrett and I are delighted to welcome Judge Durkin from the Northern District of Illinois who is sitting with us by designation this morning. Thank you for answering our phone call. All right with that we'll begin with our first case this morning which is Gallo v. Mayo Clinic Health System. Mr. Mora. Good morning justices of the Seventh Circuit. My name is Stephen Mora. I represent the plaintiff appellant in this matter. Sitting there right in the first row. If it may please the court, Your Honor, my client is the victim of a grave injustice both by the behavior of the Mayo Clinic and as a result of the wrongful decision of the trial court. In 2010, Dr. Gallo was a young attending physician at Mayo Clinic in the western area of Wisconsin. She was highly regarded, highly reviewed. As you know from reading the briefs there was an incident that occurred in 2010, an unfair and untruthful incident, but the result of it was that Dr. Gallo decided it was in her best interest to leave the employ of the Mayo Clinic and to move on in her career with employment elsewhere. But she was afraid as a result of this that moving forward might say things about her, about her performance and say bad things. It wasn't fair and it wasn't right, but she felt that she needed to negotiate a separation agreement with the clinic and she did so. She hired counsel and she negotiated a separation agreement, a very, a very fair one, but a very, very broad one. It's set out at page four of my reply brief. Even the most cursory view of it, and not necessarily by a lawyer or by a judge, shows the broad scope of this and that the total tenor of it and ideology of it was to prevent Mayo Clinic from saying anything about Dr. Gallo's performance at the clinic and certainly saying anything bad about her. Well, anything to potential employers. To potential employers, exactly. So it was a limited agreement. It was more limited perhaps than if she got it from, if they got a question from somebody who couldn't possibly be her employer, but potential is a very broad word. As it turned out, she was recruited by Mount Sinai Hospital, a large hospital in Manhattan. Actually she wasn't recruited by the hospital, she was recruited by a clinic and the inquiry from the hospital had to do with the credentialing decision. That's what the crux of this dispute is about. No, Your Honor. The original recruiting was by Mount Sinai for a position at a smaller hospital named Refua. The direct employer at the end of the day was going to be Refua. Mount Sinai, the doctor who recruited her, Dr. Mark Lebois, was the head of the Department of Dermatology at Mount Sinai. But it wasn't for a position at Mount Sinai. It was not for a position at Mount Sinai, that's correct. It was for a position and employment at Refua, a smaller hospital a distance away from Manhattan. The reason for that was that Mount Sinai had a contract, an arrangement, with Refua to provide Refua with residents from Mount Sinai. But in order for that to work, Mount Sinai, Refua had to have an attending physician who could supervise those residents. And therefore, that doctor had to meet the high standards required by Mount Sinai. Counsel, was Mount Sinai the only hospital that sent its residents to Refua? I don't know the answer to that, Your Honor. But I know in this case, Mount Sinai was the one who recruited Dr. Gallo. They thought she was a good fit for this particular position. And when they did recruit her, she talked to Dr. Lewall about it. She talked to a Dr. Manini at Refua about it. And she concluded that it was a good position for her and she would like the job. There was discussions over a variety of months, a number of months. She decided she wanted the job and therefore she applied for and got her license to practice medicine in New York. Is Refua a subsidiary of Mount Sinai? I'm sorry? Is Refua a subsidiary of Mount Sinai? It is not. But they had an arrangement with no subsidiary kind of relationship. So the employment relationship, the prospective employment relationship, was with Refua. That's undisputed. Absolutely right. So she got her license to practice medicine in April of 2014. She immediately told Dr. Manini at Refua and she told Dr. Lewall at Mount Sinai. But because of the arrangement that existed between Refua and Mount Sinai, it was Refua that needed and did negotiate the employment contract. And immediately upon being told that she had her license, sent her a written employment offer. But because her position was dependent on her being an attending physician monitoring the activities of residents from Mount Sinai, it was Mount Sinai that did the credentialing. As a result, Mount Sinai did begin the credentialing immediately in April of 2014 and they sent to Mayo Clinic what they called an affiliation verification form. Councilman Manini testified or has this affidavit in any event saying that the reason she was not hired was not the credentialing decision but rather the difficulty in the contract? Yes, there's there's evidence from Dr. Manini. That's what she says in the declaration. She was never deposed. She made that declaration two years after the facts. She claims she was able to focus in on the dates May 6th to May 15th. Interestingly though, as long as I'm responding to your question, she didn't tell anybody. She didn't tell Dr. Gallo in the midst of their contract negotiations that she'd rescinded the offer. She didn't even tell anybody at Dr. Leibwald. But what contrary evidence besides the hearsay evidence that was excluded do you have? Dr. Leibwald testified at his deposition that he was told by the credentialing committee that Mayo Clinic had filled out the affiliation verification form, which was a complete breach of the separation agreement, and in two of the categories gave a ratings affair, which is notified of that by the credentialing committee. The credentialing committee said, Dr. Leibwald is head of the Department of Credentialing, I'm sorry, is head of the Department of Dermatology. We want you to please look into this application. He testified in his deposition that he decided not to advance the application. He made that decision. He says that in his testimony. There's no mention of deposition. In the time of the events in 2014, he sent an email to Dr. Gallo on May 15th, just a day or two after he had made the decision that he would not advance her credentials. He said, your application was not adequate for credentialing. No mention of RFUA. Your application was not adequate for the Mount Sinai Credentialing Committee, and RFUA is therefore not waiting to offer you the job. He didn't say RFUA has decided not to give you the job. He said because we've, that's plain English, because we've decided your credentialing doesn't meet the standards of Mount Sinai, RFUA is not going to wait there to give you the job. Well, Counsel, he's not the decision-maker on whether or not to give a job at RFUA, and the decision-maker said she didn't take into account, was even unaware of the bad rating or the fair rating. Well, he is in part the decision-maker, because if she didn't meet the credentialing requirements of Mount Sinai, then she could not possibly get the job at RFUA. It never got that far, though. The person at RFUA said we don't want to hire her because of difficulties in contract negotiations. With all due respect, Your Honor, it's not a question of it not getting that far. There is no evidence that anybody other than Mount Sinai knew that this occurred. Dr. Manini didn't tell anybody. This declaration, without a deposition, came two years later. She focused in on a period of eight or nine days. Dr. Leibwald, according to Dr. Gallo, who called Dr. Leibwald immediately after he said you're not going to get this position because your credentialing isn't good enough, told her that it was all the fault of the affiliation verification form that was sent by Mayo Clinic and that it was the fair ratings that cost her the position. Why wasn't a deposition taken? You'll have to ask prior counsel. Well, but that's telling. I wasn't a counsel at the time. The judge, the record I saw, the judge gave plenty of opportunity for that deposition to be taken. I don't disagree with you. All I'm saying is, is it was not, it was not, she was not deposed. So it was her lonely declaration and I think her memory might well have dimmed. I'm not saying absolutely positively that her testimony is not worthwhile. What I'm saying is, is that the combination of Dr. Leibwald's testimony combined with Dr. Gallo's testimony as to what Dr. Leibwald told her makes it absolutely clear that the decision not to give her the job was made by Mount Sinai and they had the right and ability to do that because if she did not meet their Just to get back one minute to your question, Your Honor, the agreement says nothing about prospective. It says potential employer. Mount Sinai was clearly a potential employer. They were a large hospital with a large Department of Dermatology. They weren't doing, Mount Sinai wasn't doing the employing here. Mount Sinai was only credentialing. It was not employing your client. It was potential. Yes. Mount Sinai was not a potential employer. RAFUA was the potential employer. Mount Sinai had only the responsibility to make a credentialing decision so it doesn't fit within the terms of the contract if what you're complaining about is the communication from Dr. White to, or from Mayo, I think he was the only one who communicated with Mount Sinai, Dr. White to Mount Sinai. Mount Sinai was not the prospective or the potential employer. They were a potential employer. They were not the potential employer in this context. It was RAFUA. That's correct, Your Honor, but the contract is very, I disagree with you, it is very broadly drafted. It talks about a potential employer. It could be that this, that Mount Sinai might have sent out this form to 20 different potential people to take this job without having made a decision to specifically hire anybody or any one of them. They still would have been a potential employer. That's what the separation agreement calls for. Yes, RAFUA was the prospective employer but there's nothing in the contract, in the separation agreement, that says anything about a prospective employer and furthermore, we're talking about half a degree of separation here between Mount Sinai and RAFUA. One could certainly look at this as they were the agent of RAFUA doing this credentialing to find a attending physician for RAFUA. Doesn't the complaint say that there was a breach of the separation agreement that caused her not to receive the job she applied for? She applied for the job at RAFUA, not at Mount Sinai. Well, I don't think at this point after three years of this case, Your Honor, that we have to limit ourselves to what the complaint says. The contract says, the contract specifically says potential employer. This was clearly a request for a reference from a potential employer and you can say that I'm being technical but that's what the contract says. It's very specific. It doesn't say prospective. If it said prospective, we wouldn't be here. We'd have lost and we would have correctly lost but in this case, the contract is being written in the, being read by the trial court in the most I'm sorry. Your time has expired. Thank you, Your Honor. Thank you. Mr. Modell. May it please the court, counsel. Mayo Clinic asked this court to affirm the The court has got it focused on exactly what I want to talk about, the two issues, the potential employer issue and the causation issue. Potential employer issue, I thought based on the proposed findings of fact process that our district court used that that was not an issue in this case any longer. The proposed findings and I've set forth the three key ones at page 34 of the response brief were as follows. MSH, which is Mount Sinai, had never offered Dr. Gallo an employment position at any MSH entity and had not promised Dr. Gallo any future position at any MSH entity. Plans response admitted. Finding of fact 141, Dr. Lebwal at no time promised Dr. Gallo employment at MSH. Answer admitted. And finally the employment relationship was to be between Dr. Gallo and RHC, which is RFUA and not Dr. Gallo and MSH and that's also admitted. Also asked the court if there's any question to look at Dr. Lebwal's deposition testimony where he's asked that question also multiple times and at pages 10, 33, 35 and 67, 68 he makes clear that there was never to be a relationship between Mount Sinai, an employment relationship between Mount Sinai and Dr. Gallo. The two arguments that plaintiff makes is that potential has this broad meaning that it's going to potentially pick up anyone who's a hospital who Dr. Gallo being a doctor could possibly work at. The key is what the court has done is to look at the language of the agreement and the language of the agreement is a letter of reference will be provided to potential employers seeking a reference. It's very specific as to it being a potential employer. It's not broad as plaintiff would suggest that it's anybody in the medical world who potentially could employ Dr. Gallo. The other argument that plaintiff made in their brief, in her brief, was that the language of the agreement is broad enough to cover any inquiry that's made by any third party to Mayo about Dr. Gallo and clearly the language of the agreement that's unambiguous talks about potential employers. So I believe that and just listening to her argument, Judd Sykes, you asked plaintiff's counsel straight out whether or not they agree that the only employer, potential employer, was RAFUA and the answer was yes. I think that ends all inquiries because if there's not a potential employer there cannot be a breach of the agreement. But I do want to just briefly touch on, well I guess before I leave that, there was a statement made that Mount Sinai recruited Dr. Gallo. The evidence is that as a favor, and that was Dr. Lebwald's exact language in his deposition, he provided a copy of the resume, Dr. Gallo's resume, to RAFUA. It was RAFUA who was looking for a position, was not Mount Sinai looking for a position or recruiting Dr. Gallo for a position. On the causation piece that the theory, plaintiff's theory, is there's this affiliation verification credentialing form. It's a very positive form but has 13 categories. It has two fares and those two, plaintiff says, those two fares in essence caused Mount Sinai to not credential her, causing RAFUA to not hire her. A lot of dots to connect, none of which get connected. Dr. Manini is the hiring authority at RAFUA. She did a declaration because of problems getting her deposition by all parties. Did a declaration and the declaration said the credentialing decisions played no role in her decision not to hire Dr. Gallo. She said there were three reasons. This continuous renegotiation, the making demands at, and that's this May 6th email that Dr. Gallo sent after there was an issue by the parties asking for 18 changes. And I think Dr. Manini's response to that was telling because on the same day she writes to her legal counsel and her clinic manager saying I'm happy to rescind this offer. So Dr. Manini had bases that she set forth in her declaration. Those bases are not disputed with any admissible evidence. And when we look at the documents, the documents also support exactly what Dr. Manini said. She says this continuing negotiation, there is a set of emails that deal with the continuing negotiations. She talks about one reason because Dr. Gallo was making demands that were unacceptable to RAFUA and the email with the 18 demands after the I also asked the court to have a look at Dr. Lebwald's deposition because he is asked many, many times about this decision to have his person, Dr. Kim, be who was available to do this position when RAFUA no longer wanted Dr. Gallo. And he walks through that multiple times that yes, that was the key that there was somebody available and this conduct by Dr. Gallo that that was what the decision was going to be to have Dr. Kim rather than Dr. Gallo handle that position. The court had in a motion to supplement said they want to save that for oral argument. I don't know if there's anything the court wanted addressed on that. I believe that's probably more plaintiff than it is for Mayo Clinic. Apparently not. Okay, so I have. Thank you. Thank you. Mr. Mora, your time had expired, but I will give you a minute to wrap up if you have anything further to say. I do. And I appreciate your patience. I didn't realize that it had run out. The clock can be a little confusing. It's my fault. Your Honor, the whole Dr. Kim thing is a total red herring. Dr. Kim never took an additional position. That's the evidence in the case at RAFUA. It's true that under very strong leading questions asked of Dr. Leibol at his deposition that he said yes, I made the decision. There were part of it was certainly the fair ratings, but I also had Dr. Kim who was not making money where she was and that was a consideration in in the decision. But at the very end of his deposition, counsel for Dr. Gallo asked him one simple direct question. Do you remember when Dr. Kim became part of this equation? And he said I don't really remember that. I'm sorry. And he had a lot of memory lapses in his in his deposition as well. Lastly, I mean it's interesting that counsel and Dr. Menini talk about the she decided even though Dr. Leibol said he made the decision. One of the reasons for example was that Dr. Gallo had too many changes she wanted in the contract. All she had to do was write her back on May 6th. She had those changes. She never did it. There is now one item of proof in the record that Dr. Menini's memory is correct. She never wrote Dr. Gallo. She never told Dr. Leibol. We'll have to counsel wrap up now. Thank you very much. I appreciate it. Thank you. And our thanks to both counsel. The case is taken under advisement.